WESTERN DISTRICT, PITTSBURGH, 1854.

## McMasters *versus* Reed's Executors.

1. Corporations have such powers as are specifically granted by the act of incorporation, or as *are necessary for the purpose of carrying into effect the powers expressly granted,* and no others.

2. Corporations are bound by all contracts whether express or implied, whether by bond, bill of exchange, or negotiable note, entered into in the usual and necessary course of their legitimate business, except when there is a statutory prohibition.

3. The bonds of the Erie Canal Company do not fall within the statutory prohibition against issuing notes for a circulating medium in the similarity of a bank note.

4. The Erie Canal Company was obliged to contract debts for the purpose of completing its canal, and, being unable to raise money, was justifiable in issuing its bonds, bearing interest, to its creditors for work.

ERROR to the Court of Common Pleas of *Erie county.*
The Erie Canal Company was incorporated by Act of Assembly

passed March 7, 1843, for the purpose of completing the Erie Extension of the Pennsylvania Canal, then nearly finished,—the State having expended large sums of money thereon. The act vested the canal in the company, subject, however, to be resumed by the Commonwealth, sec. 14, providing for a resumption as follows : " At any time hereafter it shall be lawful for the Commonwealth, upon the passage of a law by the legislature for that purpose, to resume the said line of canal and the privileges and franchises hereby granted, by paying to the said company the amount of money expended by them in finishing and completing the same, together with the money expended for repairs and supervision, with interest thereon at the rate of eight per cent. per annum from the time the same was expended, if resumed by the State within eight years, and if after that time, seven per cent., deducting from the principal and interest aforesaid, the amount of tolls received during the period which the company has possession of said canal."

The ninth section of the act directs the manner in which the means necessary to be used in finishing the work should be raised, and is as follows :

" Sec. 9. The directors shall have power to borrow money from time to time on the security of the corporate property by mortgage of the same or any part thereof, or by pledge of capital stock, at a rate of interest not exceeding seven per cent., but the total amount of such loans shall at no time exceed four hundred thousand dollars, without the consent of the legislature ; they shall from time to time declare and make dividends of the net profits of the said company unto and among the whole number of shares into which the capital of the said company is divided. Provided, however, that before making any dividends of net profits as aforesaid, the said directors shall reserve thereout two per centum to be invested in state loans or other securities, and together with the accumulations, to constitute a contingent fund to provide for extraordinary repairs, and as a sinking fund for the extinguishing of any loans which said company may make."

Neither of the modes provided by the legislature were adopted, but engraved bonds, payable to bearer, signed by R. S. Reed, as president of the company, were prepared. The work was let by the directors to themselves, who received these bonds in payment for the work, and in turn put them in circulation.

The following is a copy of one of the obligations so issued by R. S. Reed, and now held by John McMasters, the plaintiff, and is one of those on which this suit is brought :

" State of Pennsylvania, No. 193.

$50                   Fifty Dollars      $50

The Erie Canal Company acknowledge themselves indebted to the bearer of this bond in the sum of Fifty Dollars, which sum

they promise to pay in Erie, on the 1st day of January, 1850, with interest thereon at the rate of six per cent. per annum, payable on the 1st day of January, 1845, and annually thereafter at the Erie Bank. Witness the seal of the said corporation and the signature of the President and Secretary, at Erie, this 1st day of January, 1844.

M. GOODWIN,                              R. S. REED,
    Secretary.                              President."
[Seal.]

All of the paper so issued matured on the 1st day of January, 1850, and the holders might in the event of non-payment have had a sequestrator appointed under the act of 1836, but on the 9th of April, 1850, an act of assembly was procured, by which the creditors were deprived of that remedy, and were left without any remedy against the company whatever.

After the first day of January, 1850, the plaintiff made demand of payment, and on failure of the company to pay, he instituted this suit against the defendants.

The amount issued by R. S. Reed, as shown by the evidence, was $658,418, and still further sums were issued to a large amount by his successor in office, Charles M. Reed.

On the trial, the plaintiff requested the court to charge the jury as follows:

1. That the Act of Assembly, of March 7, 1843, incorporating the Erie Canal Company, provides two methods of obtaining credit, either of which ought to be adopted, namely; *first*, a mortgage on the corporate property, and *second*, a pledge of the capital stock; that the bills or notes in this case are not authorized by the charter, are issued in excess of the powers conferred by the legislature, and bind only the person issuing them.

2. The officers who devised and issued the currency were but the agents of the corporation, and if the Act of Assembly contains no authority to make and put in circulation such notes, the corporation is not, but the agents so making and issuing them are, personally liable to the holders.

3. There is nothing in the charter of the company authorizing its officers to issue notes or bonds payable to *bearer*, to pass as money, without transfer or assignment, and the officers putting them in circulation without such authority of law, must be held personally bound for their payment, on failure of the principal to pay the same on maturity.

4. The act of incorporation, in requiring the indebtedness of the company to be secured by mortgage or pledge of stock, contemplated an effectual remedy to the creditor by proceedings to enforce a sale on the mortgage or the stock pledged, but by the device of issuing the currency in question, these remedies were taken away and the creditor left to proceed by sequestration,

which last remedy was subsequently taken away by the act of April 9, 1850, and in this way the security afforded by the act of incorporation was entirely defeated and lost, and the creditor left without remedy, except upon the personal responsibility of the officers who put the paper in circulation.

5. The Act of Assembly limited the indebtedness of the company to the sum of four hundred thousand dollars, and if the officers, in violation of the directions and provisions of the law under which they acted, have made and put in circulation a vastly greater amount, and if the jury believe from the evidence that the amount of notes put in circulation by the officers of the company now amounts to eight hundred thousand dollars or about that sum, six hundred and fifty-eight thousand four hundred and eighteen dollars of which was signed by R. S. Reed, then it is a *fraud* upon the *bona fide* holders of the paper, who had a right to rely upon the extent of indebtedness fixed by the charter, and renders the officers who signed and issued the notes liable to the holders thereof for the full amount with interest.

6. Where a corporation is established for a specific object, as in this case to complete an unfinished canal, and the charter points out one or more modes of providing the means necessary to carry out the main design, the act operates as a restriction as against any other mode than those specifically named, and if the officers see proper to devise and carry out a plan of their own and one not authorized by the act of incorporation, and afterwards seek to cure the error by legislative enactment, such enactment must be clear and unequivocal in its terms, and must distinctly name and describe the illegal issue and in direct terms legalize the same; a mere allusion to the erroneous circulation in an act passed for another object in relation to the company or otherwise, will not be sufficient.

7. If the act of incorporation gave no authority to issue bonds or notes such as these in question, no resolution of the board could authorize the president or justify him in issuing or signing them so as to release him from personal liability, if the same is in excess of the corporate power of the board, and particularly so, as he was one of the board, and assisted in passing the resolution himself.

8. If the jury believe the evidence, the corporation refused to pay the paper now in suit before action was commenced, and is evidence that it was repudiated by it.

9. That the evidence given and relied upon by defendants, consisting of the act of 9th April, 1850, prohibiting the sequestration process as to this company, excepting for repairs, is evidence that the company has refused and does refuse to pay the notes according to the contract made by defendants, and there-

fore there is no resort on the company by the holders of the same.

To which the court, McCALMONT, P., gave the following answers:

1. The bills or bonds were not expressly authorized by the Act of Assembly, but we refuse to instruct you that they bind only the persons issuing them. If you believe they were issued by authority of the directors at a regular meeting, under resolutions of the board, for the purpose of paying the contractors for work done in the construction of the canal, and that the president signed and the secretary attested the bonds in pursuance of those resolutions, and that the interest was paid annually thereon at the office of the company to the holders thereof, until the first of January, 1850, and the remaining interest from that time, at the office of the company, is indorsed upon the bonds, until 1853, then the company would be liable; and the president of the company, Rufus S. Reed, was not liable in his lifetime for the payment of them, without an express promise to pay them.

2. Notwithstanding this might be true as an abstract proposition, yet whether the defendants be liable in this case depends upon the facts and answers to the other points.

3. There is nothing in the charter of the company expressly authorizing it to issue bonds payable to bearer. Whether the bonds were issued to pass as money, would be a question of fact. This point is otherwise answered in the negative.

4. It is unnecessary for us to say whether the Act of Assembly left the bond-holders without any other remedy. Whether Rufus S. Reed was responsible in his lifetime, or his executors after his death, on failure of the company to pay the bonds at maturity, are questions depending upon the facts of the case under the law as given you in the answers to the other points.

5. Answered in the negative.

6. We are of opinion that the subsequent Acts of Assembly are not sufficient to legalize the bonds if otherwise illegal. If the bonds were issued for the purpose of raising money to carry on the work, and the money thereby obtained, they would have been illegal; and the officers issuing them for that purpose, or their agents who used them, would have been liable to the proper parties in an action for the money paid or the labor expended upon them. The Act of Assembly did not authorize the company to borrow money in any other way than those specified in it. And, as qualified by our answer to the first point, we answer this one in the affirmative.

7. Answered in the negative.

8. The evidence is that payment was demanded before suit brought, and that they did not pay it. But taken in connection with the payment of interest it may be evidence, but very slight

[McMasters *v.* Reed's Executors.]

evidence, that the company denied the validity of the bonds, and their legal obligation to pay them.

9. Answered in the negative.

The defendants requested the court to charge the jury as follows:

1. That there is nothing in the act of the General Assembly incorporating the Erie Canal Company, or any of the supplements thereto, prohibiting said company giving to its creditors its bonds or other evidence of indebtedness for debts contracted by it in the construction of the canal.

2. If the jury believe from the evidence, that the bonds given in evidence by the plaintiff (called Erie canal bonds) were issued by order of the board of directors of the Erie Canal Company, in pursuance of contracts previously made by said directors with contractors for work and material furnished in the construction of the said company's canal, and were taken and accepted by said contractors as evidence of debt against said company, it is legally liable for the payment of the same, and not the defendants' testator.

3. That the bonds given in evidence as the foundation of the plaintiff's claim show upon their face that they are the bonds of the Erie Canal Company, and negative every thing like an undertaking on the part of Rufus S. Reed to pay the money therein specified out of his private estate; consequently the plaintiff is not entitled to recover against the defendants.

4. If the issuing of the said bonds was not authorized by the act of incorporation of the Erie Canal Company, the several acts of the legislature passed the 10th day of April, A. D. 1846, the 24th day of June, A. D. 1849, the 9th day of April, A. D. 1850, and the 12th day of April, A. D. 1853, fully recognize and virtually sanction said issue, and that the said bonds are a legal debt against the said Erie Canal Company; consequently there was no liability on the part of the defendants' testator.

5. If the jury believe from the evidence that said bonds were issued as the evidence of a pre-existing debt of the Erie Canal Company by the authority of the board of directors of said company, the company only is liable, and no individual liability attaches to the president, who only carries out the resolution of the said board of directors.

6. The bonds given in evidence by the plaintiff are clearly the obligations of the Erie Canal Company, and there is no intention expressed upon their face, of an undertaking upon the part of the defendants' testator to incur any personal liability upon him, contrary to the express intention exhibited upon the face of the bonds.

7. If the jury believe from the evidence that the said bonds given in evidence by the plaintiff were executed and delivered

by Rufus S. Reed, defendants' testator, to other persons than the plaintiff, and that the said plaintiff has come to the possession of said bonds by delivery or transfer from other parties than the said Rufus S. Reed, in that place the plaintiff cannot recover in this action.

8. The said bonds are not negotiable, and if illegally and unlawfully issued are mere *choses in action*, and the delivery of them to parties strangers to the original contract, transfers to the holder no right of action in his own name against the executors of the alleged wrongdoer.

9. If the jury believe from the evidence that the plaintiff did not get the bonds which he gave in evidence directly from Rufus S. Reed, the defendants' testator, he cannot sustain the action against the defendants.

The court answered the 1st, 2d, 5th and 6th points in the affirmative; the 4th point in the negative. The 3d, 7th, 8th and 9th points were answered as follows:

3. There might, notwithstanding, be an undertaking of Rufus S. Reed to pay, if the evidence supported the declaration, and therefore this point is answered in the negative.

7. If the jury believe the bonds were issued to other persons than the plaintiff, then even if the same were illegal, we are of opinion that an action could only be maintained upon the consideration of the bonds, and in such case it would be necessary for the plaintiff to sue the person from whom he received them, or to use the name of the first holder as the plaintiff. That in such case he could not sue in his own name unless he was induced by the acts and declarations of Reed to take them, aside from the signatures on the papers, or unless there was an express promise by Reed to pay the same to the plaintiff.

8. This point is answered in effect by our answer to the 7th.

9. Whether he got the bonds directly from Reed would make no difference, if he were otherwise entitled to recover. A man who performs work or pays money on the request of any one, and the obligation given for the consideration is fraudulent or illegal, he may recover the price of his labor, or the money paid, on the common counts. But in that case he must sue the person at whose request or for whom he performed the consideration.

In the present case there are no common counts in the narr. We have considered it as if they were added.

With these qualifications the point is answered in the affirmative.

The answers of the court to plaintiff's 1st, 2d, 3d, 4th, 5th, 7th, 8th and 9th points, and to defendants' 1st, 2d, 5th, 6th, 7th and 9th points, were assigned for error.

*Thompson* and *Galbraith* for plaintiff in error.—The Act of

Assembly incorporating the Erie Canal Company, after giving, in the 3d section, the usual powers of corporations, and providing against the exercise of any banking privileges whatever, goes on to provide for the organization, election of officers, &c.; and in section 9, page 40, Pamphlet Laws, 1843, empowers and directs as follows as to the mode of providing funds for the building and completion of the work.

Sec. 9. "The directors shall have power to borrow money from time to time on the security of the corporate property by mortgage of the same, or any part thereof, or by pledge of capital stock, at a rate of interest not exceeding seven per cent.; but the total amount of such loans shall at no time exceed four hundred thousand dollars, without the consent of the legislature," &c.

This section points out two modes by which the funds necessary to complete the work might be raised: one by mortgage, the other by pledge of stocks. It limits also the amount of such indebtedness to the sum of $400,000. The positions we assume in this case for the plaintiff are, that as the act incorporating the Erie Canal Company points out the specific mode and manner in which the financial affairs of the company should be managed, and limited the amount of loans to a sum certain, the directors were bound by those restrictions and directions, and must pursue the mode pointed out or none. If the officers chose to adopt a different method than that marked out in the charter, and built the work by putting in circulation an anomalous kind of currency, which while bearing the seal of the company, is in fact mere notes, or bills payable at a future time, with interest, and still more, if such currency was put out to an amount largely exceeding the sum limited by the charter, then the issue was illegal and unauthorized, and the corporation would not be bound, and in that event the officers who issued the notes or bonds are individually and personally liable, upon the well-settled principle that an agent of an individual or of a corporation who exceeds his authority by executing papers which do not bind his superior or principal, is personally responsible.

And first to the question involved in the 1st, 2d, 3d and 7th points of plaintiff, and the 1st, 2d, 3d and 5th points of defendants.

A corporation, being the mere creature of the legislature, has no powers other than those specifically named in and expressly given by the terms of its charter, and when the act of incorporation directs an act to be done in a particular manner, it can be done in that way only. *Langolf* v. *Seiberlitch*, 2 Pars. 72; *Bank of Pennsylvania* v. *Commonwealth*, 7 Har. 152; *Packer* v. *Sunbury & Erie R. R. Co.*, 7 Har. 218; 2 Kent's Com. 299. The modern language of the English courts is to the same effect, and in a recent case, (*Boughton* v. *Manchester Waterworks*, in

3 Barn. & Ald. 215,) it was observed that a corporation could not bind themselves for purposes foreign to those for which they were established. Where a corporation was created for *purposes of trade*, it resulted necessarily that they must have power to accept bills and issue notes. But if a company be formed not for the purposes of trade, but for other purposes, as for instance to supply water, the nature of their business does not raise a necessary implication that they would have power to issue notes and bills, and there must be express authority to enable them to do it. The acts of corporation agents are construed with equal strictness, and it is the doctrine that though a deed be signed by the president and cashier of a corporation and be sealed with the corporate seal, yet the courts may look beyond the seal, &c.

The same doctrine is supported and affirmed by the decisions of the United States Court in a number of cases, and by the courts of New York, Massachusetts, and other states. *Head* v. *Providence Ins. Co.*, 2 Cranch, 127 ; *Beatty* v. *Knowles*, 4 Pet. 152–168 ; *People* v. *Utica Ins. Co.*, 13 Johns. 383 ; *Beatty* v. *Marine Ins. Co.*, 2 Id. 114 ; 3 Denio, 283.

In the case of *The State of Ohio* v. *The Library Co.*, 1 McLean's Ohio Reps., it was shown that the charter creating it a corporation and giving it a capacity of suing and being sued, making by-laws, and even the power to make contracts and dispose of any real or personal estate "*in any mode the corporation may deem most proper*," confers no authority to exercise banking franchises.

The *implied* powers incident to an act of incorporation are only such as are absolutely necessary to carry out the powers expressly granted. Angel on Corp. 298.

*McClure and others* v. *Bennett*, 1 Blackford's Indiana Reports, page 189. In this case the trustees of a church had given a note as follows; "For value received this 2d October, 1820, we the trustees of the first Presbyterian congregation in the town of Madison, Indiana, do bind ourselves and our successors in office to pay A. B. or order on demand 769 dollars." *Held*, that they were personally liable. *Taft* v. *Brewster*, 9 Johns. 384 ; *Mott* v. *Hicks*, 1 Cow. 536 ; 3 Wend. 94; *Randall* v. *Van Vechten*, 19 Johns. 60.

The 7th, 8th and 9th points of defendants assume that the notes or bonds are not negotiable, and that the suit could only be brought in the name of the original holder for use, &c. In reply to this position we contend that the paper is as it was made, and issued by R. S. Reed. He chose to make it payable to *bearer*, its appearance and the form in which it is drawn giving it circulation. It was an undertaking to pay the holder or bearer, whoever he might be, so much money. In this there was nothing immoral or *mala in se*, and it is not for the defendants

[McMasters *v.* Reed's Executors.]

now to evade the agreement of the testator.  If the position assumed be correct, no suit could be sustained against the canal company unless in the name of the original holder—and as these bonds, or the most of them, have circulated for years and passed through many hands, it would be impossible to identify or ascertain the original owner or the intermediate ones.  Besides, if these are not the bonds of the company, but, as seems to be conceded by the judge, an unauthorized issue, then the seal becomes a mere nullity, and the paper has not the qualities of a bond at all, it is an assumption of Mr. Reed alone.  The seal is not that of Mr. Reed, and calling it a bond does not make it so, if it lacks the requisites necessary to a specialty.

The design of the framers of the act incorporating the Erie Canal Company seems in one way and another to have been almost wholly evaded so far as the State itself and third persons are concerned.  The act limits the credit of the company, apart from stock, to four hundred thousand dollars, which limitation was based doubtless upon reported estimates of the cost of completing the work.  It also provides for a resumption by the State upon re-payment to the company of the amount expended, and for this purpose it was required of the company that an account of expenditures be kept.  If the financial affairs of the company had been managed in the manner directed by the law, a fraud upon the Commonwealth would have been almost impossible; but with the adoption of the system of currency shown in the evidence, this safeguard disappears, the interests of the State and of the corporation, of which Mr. Reed and the other directors were mere agents, are lost sight of; acting in the double capacity of directors and *contractors*, their interest comes in conflict with their duty, and the *nominal* expenditure is inflated to an amount far exceeding the limits of the charter.  The operation of the plan, so far as the Commonwealth is concerned, must be in the highest degree unjust.

Its operation upon individuals is no less so.  At the time of the passage of the act of incorporation, the act of 1836, in relation to sequestration, was in operation, and the creditors of the company could have proceeded under it to sequester the tolls, or if mortgages were given, a proceeding *in rem* might have been had.  No mortgages were given, no stock was pledged; and about the time the bills fell due an act was passed by which the Erie Canal Company was exempted from the operation of the sequestration law.  This we contend, in our ninth point, together with the fact of a refusal to pay, as shown in the proof, was evidence of a repudiation of the bonds, and left the plaintiff without remedy against the corporation—with no remedy in fact except that now sought for.

*Marshall* and *Walker*, for defendants in error.

The action below was assumpsit brought by plaintiff to recover the amount of certain bonds issued by the Erie Canal Company, and signed by defendants' testator as president of said company. The declaration alleges that said company had no authority to issue said bonds, and the president incurred a personal liability in signing them.

1. We contend that the Erie Canal Company had full right and power to issue said bonds as evidence of a *pre-existing debt incurred in the construction* of the canal.

2. If there was no such power granted, either expressly or by implication, to the company to issue said bonds, still when it was done by the express authority of the company, and by it always recognized as the debt of the company, no liability was thereby individually incurred by the president.

3. If said bonds were illegal and void as to the Erie Canal Company, and the president, in issuing them, incurred a personal liability, still the said bonds, or the debt they purport to evidence, is not negotiable or assignable in its character, so that any remote party can sustain an action in his own name.

They referred to the 9th, 10th, 19th and 23d sections of their act of incorporation. *Mars* v. *Ashley*, 2 Hill, 265; *Barker* v. *Mechanics' Fire Ins. Co.*, 2 Wend. 94; *Matt* v. *Hicks*, 1 Cow. 512; *Kelley* v. *Mayor of Brooklyn*, 4 Hill, 263; *Ruyter* v. *Trustees of St. Peter's Church*, 3 Barb. Ch. R. 119; 3 Camp. R. 238; *Farmers' Loan and Trust Co.* v. *Clawes*, 3 Camp. 470; *Mann* v. *The Commission Co.*, 15 Johns. 44; *Spear* v. *Crawford*, 14 Wend. 20; *The State of Indiana* v. *Woram*, 6 Hill, 33; *Hopkins* v. *Mehaffey*, 11 S. & R. 126; *Harman* v. *Tappenden*, 1 East, 555; 3 Esp. 278; *Rea* v. *Wadham College*, 1 East, 560; *Thayer* v. *Boston*, 19 Pick. 511; *Life and Fire Ins. Co.* v. *Merchants' Fire Ins. Co.*, 7 Wend. 31; *Randall* v. *Van Vechten*, 19 Johns. 160; *Sohman* v. *New York and Erie R. R. Co.*, 2 Sanf. R. 39; *Flint* v. *Clinton*, 12 N. H. 430; *Planters' Bank* v. *Sharp*, 4 Smedes & Marsh. 75; *Pitman* v. *Kinnter*, 5 Black. 251; *McDonough* v. *Templeman*, 1 Harris & Johns. 156; *Bank of Metropolis* v. *Guttschlick*, 14 Pet. 29; *Dubois* v. *Delaware and Hudson Canal Co.*, 4 Wend. 285; *Damon* v. *Greenley*, 2 Pick. 345–353; *Bank of Columbia* v. *Patterson*, 7 Cranch, 304; *Fahnestock* v. *Schoyer*, 9 Watts, 102; *McDoal* v. *Yeomans*, 8 Watts, 361; *Hopkins* v. *Cumberland Valley R. R. Co.*, 3 W. & S. 410; *Freval* v. *Fitch*, 5 Wh. 325; *McClure* v. *Bennett*, 1 Black. 189.

The opinion of the court was delivered in November, 1854, by LEWIS, J.—This is an action of assumpsit brought for the

purpose of charging the estate of R. S. Reed, deceased, with the amount of a large number of bonds issued by and in the name of the Erie Canal Company. The bonds are in form engagements by the corporation, and were issued by authority of the board of directors. They are duly authenticated by the corporate seal, and attested by the president and secretary. They bear date 1st January, 1844, and purport to bind the company to the bearer for the payment of the sum therein mentioned, on the 1st January, 1850, with six per cent. interest, payable annually. The whole amount issued during the presidency of the defendants' testator was $658,418. There is no evidence that he engaged to pay them, or that he made himself liable for them in any other manner than by the act of signing them as president of the corporation. There is no evidence that he had any interest in the contracts on which they were issued. Nor has any claim been made on the ground that the other directors were interested in them. It was held in *Gordon* v. *Preston*, 1 Watts, 387, that a director may sustain the relation of a creditor to the corporation, and may even take a mortgage against it without prejudice to his title. But as the plaintiff has not thought proper to put his claim on this ground, we may fairly presume that he has satisfactory reasons for waiving the question, and we follow his example.

When an agent is sued for an act done in the name of another, he is in general required to show his authority. But when, as in this case, he has shown full authority from the corporation for his acts, and has also shown that the corporation possessed a general authority to make contracts of the kind in question, relating to its legitimate business, he has shown all that is required in the first place. *Such contracts, like notes given by one partner in the name of the firm, will be intended to have been given for legitimate objects, until the contrary appears. There is no presumption against them.* 3 Wend. 97. *The party alleging that they were given for illegal objects, must establish his allegation. If the holders of bonds and other negotiable paper against corporations, having general authority to make such contracts, were bound to encounter the presumption that they were illegal, their character and value would be destroyed, and the mischief would be intolerable.* In this case there is no evidence to repel the presumption that the bonds were issued in the course of the lawful business of the company. On the contrary, the evidence is that they were given to the contractors for work done in completing the canal. This brings us to the question—Had the corporation power to issue them for that purpose?

It is sometimes said, that "privileges not expressly granted in a charter are withheld." *Bank of Pennsylvania* v. *Common-*

*wealth,* 7 Harris, 153; *Packer* v. *Sunbury & Erie R. R. Co.,* 7 Harris, 218. At other times it is declared, that a corporation can "exercise no powers except those which the law confers upon it, or which are incident to its existence." *Perrene* v. *Ches. & Del. Canal Co.,* 9 Howard, 184; *Dartmouth College* v. *Woodward,* 4 Wheat. 636; *Bank of Augusta* v. *Earle,* 13 Pet. 589; *Rungan* v. *Caster,* 14 Pet. 129. These rules were applied to cases in which the corporations were claiming monopolies in conflict with the rights of the government, or its grantee, or were demanding exemption from their proper proportion of the public taxes. The rules were sufficient for the cases to which they were applied; but they are not stated with sufficient precision for general application, and they do not accurately express the true rule for the decision of cases in which there is no conflict with the government or its grantee, and where no privilege is claimed in derogation of the public rights. Corporations possess both *powers* and *privileges.* These powers are often expressed in their charters. But they are frequently *implied* from the *duties* imposed. In the latter case they are but *incidents* to the *principal* matter, and partake so much of its character that they ought to be denominated *duties* instead of *privileges.* A corporation may be clothed with power to perform its duty, to bear a burthen, to pay a debt, or if unable to pay immediately, to give an obligation for it payable at a future day. But this *power* can scarcely be called a *privilege,* which is to be grudgingly withheld, unless expressly granted by its charter. And any construction which would relieve corporations from these obligations would be inverting altogether the rule of strict construction, and would in fact be conferring privileges of a character highly injurious to the public. The true rule applicable to the case now under consideration is given by Chancellor Kent, in these words: "The modern doctrine is to consider corporations as having such powers as are specifically granted by the act of incorporation, or as *are necessary for the purpose of carrying into effect the powers expressly granted,* and as not having any other." 2 Kent, 298. The Supreme Court of New York has adopted the same rule: "A corporation for a specific object has no rights except such as are expressly granted, and *those that are necessary to carry into effect the powers granted.* Many powers and capacities are tacitly annexed to a corporation duly created; but they are such only as are *necessary to carry into effect the purposes for which it was established." The People* v. *The Utica Ins. Co.,* 15 Johns. 383; *N. Y. Firemen's Ins. Co.* v. *Sturges,* 2 Cowen, 675; *Same* v. *Ely,* 2 Cowen, 699. Angel & Ames also announce the general rule to be that a corporation "has power to make all such contracts *as are necessary*

*and usual in the course of business, as a means to enable it to attain the object for which it was created, and none other."* Angel & Ames on Corporations, 245. And the Supreme Court of this State, has distinctly adopted the rule that "a corporation duly created has *tacitly annexed to it, without any express provision,*"—" every capacity that is necessary to carry into effect the purposes for which it was established." *Dana* v. *The Bank of the U. S.,* 5 W. & S. 243. In accordance with this principle, it has been declared in a work of authority, that "in general an express authority is not indispensable to confer upon a corporation the right to borrow, to *deal on credit,* or become drawer, endorser, or acceptor of a bill of exchange, or to become a party to *any negotiable paper.*" Corporations are expressly mentioned in the statute of Anne, respecting promissory notes, "as persons who may make and endorse negotiable notes, and to whom such notes may be made payable." Angel & Ames, 234; *Mott* v. *Hicks,* 1 Cowen, 513; *Kelley* v. *Mayor of Brooklyn,* 4 Hill, 265; *Moss* v. *Oakley,* 2 Hill, 265; *Barker* v. *Mech. Ins. Co.,* 3 Wend. 97. These authorities are full to the point. But it seems clear upon principle, as well as upon authority, that corporations are bound by all contracts, whether express or implied, whether by bond, bill of exchange, or negotiable note, entered into in the usual and necessary course of their legitimate business, except where there is a statutory prohibition. The case of *Broughton* v. *The Manchester and Salford Waterworks* is sometimes cited as an authority against this proposition, but it cannot be so regarded. There was a prohibition by statute in that case, and the decision was placed upon that ground. 3 Barn. & Ald. 1.

The charter of the Erie Canal Company contains the usual grant of corporate powers. The company is expressly authorized to purchase, sell, mortgage, and otherwise dispose of its real and personal estate, and to do all other things "necessary for the proper business of the company." What is "the proper business of the company?" The completion of the canal and its preservation for the uses designated by law. It had therefore a right to enter into contracts for the work required for these objects. It was not usual, and was quite unreasonable, to pay before the work was done. The company was therefore inevitably obliged to contract debts for these purposes. If unable to raise the money for immediate payment, honesty required that it should give satisfactory engagements to pay at a future period, with legal interest for the delay. The corporation was unable to borrow money to complete the work. It gave these obligations to its contractors in payment of debts contracted in "its proper business." They are binding upon it unless they fall within the meaning of some statutory prohibition. The obligations have

neither the form nor the substance of bank notes. There is no evidence that they were issued in the business of discounting notes, or for the purpose of creating a circulating medium. They are simple obligations, given for the payment of lawful debts, and made payable to bearer. They do not therefore fall within the prohibition respecting the exercise of "banking privileges." For the same reason they do not fall within the meaning of the 9th section of the charter, which relates exclusively to a *loan* of *money*, and not to securities given for debts contracted in the legitimate business of the company. That section purports to be a grant of power, and must not be construed as restricting power already granted. It has been held that even the *incidental* power to issue negotiable notes is not taken away by mere affirmative words directing a certain form of contracting. *Kelley* v. *Brooklyn*, 4 Hill, 263. It is our duty to construe the several clauses of the act so that they will all be operative and stand in harmony with each other, if that be possible. There is no difficulty whatever in doing so. The 2d section authorizes mortgages for *debts* contracted in the necessary business of the company. The 9th section relates altogether to a *loan* of *money*. The 2d section gives no power to contract for the payment of more than *legal interest*. The 9th section allows a mortgage for a higher rate, not exceeding seven per cent. per annum. The 2d authorizes a lien upon such property as may not be necessary to the existence and great public object for which the company was created, and consequently gave no power to encumber or transfer the canal itself, beyond the process of sequestration. 9 W. & S. 27. The 9th section may have been intended to bind all its corporate property without exception. That it was not intended to exclude the corporation from the power to contract *other debts*, is manifest from the 10th section, which provides that on a sale of the mortgaged property, the proceeds shall be first applied to the payment of "the *loans* secured by mortgage, and then to the *other debts* of the company."

It is not necessary to consider the other points discussed by counsel. Enough has been said to show that the case was properly decided in favor of the defendants below.

Judgment affirmed.